**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

**AMBER RUCKER,**

               **Plaintiff,**

**v.**

**PRESIDENT AND FELLOWS OF
HARVARD COLLEGE**

               **Defendants.**

**Case No. 1:20-cv-11761-NMG**

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF MATERIAL FACTS**

Plaintiff disputes and otherwise responds to Defendant's Statements of Fact as follows:

**Amber Rucker's Lawsuit Against Harvard**

1. Plaintiff filed a Charge of Discrimination in this matter with the Equal Employment Opportunity Commission on October 13, 2019, in which she alleged that Harvard "denied [her] the opportunity for reclassification in the appropriate time-frame because of [her] race[,]" and that even after she was reclassified, her salary was "not in line with the salaries of [her] White counterparts." (Declaration of Alexandra Pichette ("Pichette Decl."), Exhibit A, *Charge of Discrimination*).

Response: Admitted.

2. Plaintiff filed her Complaint in the United States District Court, District of Massachusetts on September 28, 2020 against her former employer, Harvard (Doc. No. 1).

Response: Admitted.

3.   In her three-count Complaint, Plaintiff alleged that she was discriminated against on the basis of her race (Black) in violation of state and federal anti-discrimination laws Mass. Gen. Laws c. 151B § 1, *et seq*. ("151B") (Count I) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. c. 2000e, *et seq*. ("Title VII") (Count II), in terms of her salary and the pace at which she was promoted. (Doc 22-1).[1] She has also brought a claim alleging that she was paid less than her male "comparators for comparable work," in violation of the Massachusetts Equal Pay Act, Mass. Gen. Laws c. 149 § 105A (Count III). (Doc 22-1).[2]

Response:  Admitted.

4.   Plaintiff also made allegations regarding a hostile work environment and constructive discharge. (Doc 22-1). These allegations were dismissed from her Complaint for failure to satisfy her administrative pre-requisites. (Doc. No. 16, p. 8) (noting that Plaintiff may still pursue her "race discrimination claims to the extent they depend upon her alleged job classification and salary differential.").

Response:  Admitted.

**Ariadne Labs**

5.   Ariadne Labs is a health system innovation center, operated jointly by the Harvard T.H. Chan School of Public Health ("Harvard" or the "Harvard School of Public Health")), and Brigham and Women's Hospital ("BWH").  (Doc 22-1, ¶ 5).

Response:  Admitted.

---

[1] Plaintiff originally filed her Complaint against Harvard T.H. Chan School of Public Health and Ariadne Labs. Plaintiff moved to amend the complaint to correct a misnomer party (Doc No. 22) and filed a Complaint against the President and Fellows of Harvard College (Doc No. 22-1).
[2] Plaintiff did not allege before the EEOC that she had been discriminated against on the basis of her gender under 151B or Title VII, and she does not make these claims in this lawsuit.

6.   Ariadne Labs does not maintain a separate, corporate identity; workers at Ariadne Labs are hired by and work for either parent institution: Harvard or BWH. (Declaration of Elissa Brennan ("Brennan Decl.") ¶ 2, filed herewith, at Exhibit 1).

Response:  Denied.  Ariadne Labs is a joint center of Brigham & Women's Hospital and the Harvard School of Public Health.  The two institutions have an agreement that binds the two and, collectively, grants and finances flow through both to fund Ariadne Labs. Scott Dep. pg 8-10. To that extent, Ariadne Labs did not differentiate between "Harvard" employees and "Brigham" employees; rather, Harvard employees managed Brigham employees and vice versa.  George Dep. pg. 50-51. Kahn Dep. pg. 11.

**Harvard Practices Relating to Reclassification or Promotion**

7.   Each clerical or technical position at Harvard is assigned a job title and classified as one of ten salary grades. (Brennan Decl. ¶ 4).  These assignments reflect judgments about the degree of skill, ability, and training required to perform the job as well as the complexity and value of the job relative to others performed at the University. (*Id.*) Each grade has a salary range with a minimum and maximum salary based on a number of internal and external factors, including salaries for similar work offered in competitive labor markets, other economic indicators, and University and local budgetary circumstances. (*Id.*) The salary range of each grade allows Human Resources to set salaries appropriately for different positions within the same grade and recognize different levels of expertise and performance. (*Id.*)

Response:  Denied in part.  Plaintiff admits that the salary assignments reflect judgments of the Defendant.  Denied to the extent that Statement of Fact 7 seeks to communicate that salary assignments cannot, or do not, take into consideration the race of a candidate, Statement of Fact 7 is denied on the basis that the record reflects that Plaintiff was given far

3

less opportunity for advancement and promotion over her White comparators, therefore unfairly increasing their salaries over Plaintiff's.  Scott Dep. pg. 30-31; George Dep. pg. 13-15, 17-19; Kahn Dep. pg. Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

8.   Harvard employees, including those working at Ariadne Labs, can undergo a material change in their position, title or salary in one of three ways:[3] (1) they can undergo the reclassification process, in which an employee's existing position may be reclassified and assigned a new job title and/or salary grade, typically with an increase in compensation; (2) they can be promoted, in which an employee (or her manager on her behalf) pursues a newly created or budgeted role; or (3) they can apply for and receive a posted open position, which is a position that is separately established and funded and would be filled by a third-party if not the internal candidate. (*Id.* at ¶ 5).

Response:  Admitted.

9.   With respect to reclassifications at Ariadne in the relevant time period, if a manager or the employee believed the employee's increased responsibilities, competencies, and skills justified a reclassification of her position, the manager or the employee would initiate the process by submitting a written recommendation to an internal Ariadne Labs "Talent Team," that may be staffed by employees of either or both Harvard or BWH. The manager would then partner with the Talent Team to draft a Job Review Form to submit to the "parent HR department," i.e., the human resources department at either Harvard's School of Public Health or BWH. (*Id.* at ¶ 6).

Response:  Denied in part.  Plaintiff admits that the reclassifications reflect judgments of the Defendant.  Denied to the extent that Statement of Fact 9 seeks to communicate that

---

[3] Employees, like Plaintiff, who are members of the Harvard Union of Clerical and Technical Workers ("HUCTW") receive regular wage increases pursuant to the Collective Bargaining Agreement between Harvard and HUCTW. (*Id.* at ¶ 5).

reclassifications cannot, or do not, take into consideration the race of a candidate, Statement

of Fact 9 is denied on the basis that the record reflects that Plaintiff was given far less

opportunity for advancement and promotion over her White comparators, therefore unfairly

increasing their salaries and titles over Plaintiff's.  Scott Dep. pg. 30-31; George Dep. pg. 13-

15, 17-19; Kahn Dep. pg. Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

10. As set out in Ariadne's *Ariadne Labs Promotions and Reclasses Process Revision 2019*

*("Reclassification Process")*, a reclassification is not appropriate simply because an employee

has passed a "milestone" or has been employed for a certain number of years. (Pichette Decl.,

Exhibit B, *Ariadne Labs Promotion and Reclasses Process Revision 2019*; *see also* Brennan

Decl. ¶ 7.)  However, the time an employee has served in her position is relevant to the

process—in order to demonstrate that the employee has actually taken on new responsibilities,

competencies, and skills, she must have been performing at this new, higher level for a

substantial period of time. (Brennan Decl. ¶ 7).

Response:  Denied.  Defendant did not promote or reclassify consistent with its written

policy, to the detriment of Plaintiff and to the benefit of her White comparators.  Scott Dep.

pg. 30-31; George Dep. pg. 13-15, 17-19.

11. Notably, while the employee or the Manager/Talent Team may make a recommendation

regarding a potential change to an employee's compensation, grade, or institutional title, each

parent entity is ultimately responsible for final personnel decisions for its own employees,

including those relating to hiring, reclassifications, and compensation, in compliance with its

policies and procedures; indeed, members of the Harvard School of Public Health's HR

department, who work on promotions or reclassifications for Harvard employees at Ariadne, do

not have direct access to the salaries of BWH employees who work at Ariadne, nor do they provide this information to BWH.   (*Id.* at ¶ 8).

Response:  Denied in part. Defendant participated in the reclassification and promotion recommendations to the detriment of Plaintiff and to the benefit of her White comparators. Id.

**Plaintiff's Hire at Harvard/Ariadne**

12. On March 20, 2017, Plaintiff was hired by Harvard for a one-year term position on Ariadne's Delivery Decisions Initiative ("DDI") team.[4]  (Pichette Decl., Exhibit C, *Offer Letter*). She was a member of the bargaining unit for the Harvard University Clerical and Technical Workers union ("HUCTW"). *Id.*

Response:  Admitted.

13. At Ariadne, a term position, like the one Plaintiff applied to and received, is supported by a specific grant; if the grant is not renewed, there will be no funding for the position and the employment will end. (Brennan Decl., ¶ 10).

Response:  Admitted.

14. Plaintiff was hired as a Project Coordinator I for the DDI Team, at a grade 54. She was paid an hourly rate of $29.67 for a 35-hour work week, or, a salary of $54,000 annually. (Pichette Decl., Exhibit C, *Offer Letter*).

Response:  Admitted.

15. A Project Coordinator I is an administrative position, and Plaintiff was responsible for, *inter alia*, helping to develop and maintain program materials; assisting with project work plans,

---

[4] The DDI team addresses the safety, affordability, and experience of care for mothers and babies, with the goal of establishing best practices for solutions that can scale across disparate and complex health systems. (Doc 22-1).

timelines, and quarterly reports; assisting with the logistics and documentation of grant applications; supporting the team Project Manager with team records to ensure compliance; and helping to book travel for team leadership and travel itineraries for guests at large meetings, called convenings; and assisting with the logistics related to convenings.  (Pichette Decl., Exhibit D, Deposition of Amber Rucker ("Rucker Dep."), pp. 37-38 and Exhibit 2, *Project Coordinator Job Description*.)

Response:  Admitted.

16. In or around October 2017, Plaintiff received a raise to $30.26 per hour, or $55,080 per year as a result of structural increases under the collective bargaining agreement between Harvard and the HUCTW. (Rucker Dep., p. 45).

Response:  Admitted.

17. In March 2018, Plaintiff's position was extended to March 20, 2019.  (Rucker Dep., p. 47).

Response:  Admitted.

18. Within the first year of Plaintiff's employment, Plaintiff's then-manager, Grace Galvin, advised Plaintiff about the steps she should take to become eligible for a promotion or reclassification, including taking more ownership of her work and taking on some of the managerial responsibilities, particularly with respect to research. (Rucker Dep., p. 49-50).

Response:  Denied.  Plaintiff complained to Grace Galvin (and others) that white individuals were being promoted and reclassified unfairly, and instead of her.  Defendant recognized that, when it gave Plaintiff opportunity, she performed jobs outside of her job description well.  George Dep. pg. 17-18; Kahn Dep. pg. 35-36.

19. In or around this same time period, Plaintiff discussed her potential for advancement with Amy Lieb, Ms. Galvin's manager, in a series of quarterly meetings. (Rucker Dep., p. 56). Ms. Lieb made similar recommendations, including that Plaintiff learn to anticipate her manager's expectations, improve her technical competencies and attention to detail, and improve some "soft skills" such as time management, partnering with Ms. Galvin more effectively, and focus on higher priority tasks. (*Id.* at pp. 59-60).

Response:  Denied.  Amy Lieb's forgone conclusion was that Plaintiff should not be promoted, despite any effort she made, and systematically promoted Plaintiff's White comparators. Kahn Dep. pg. 25-27, 32.

20. In May 2018, Plaintiff's then manager, Grace Galvin, prepared her 2018 performance review. (Rucker Dep., pp. 54-55 and Exhibit 3, *2018 Review*). In the review, Ms. Galvin wrote that Plaintiff had performed well in 2018, and that she was looking forward to Plaintiff further developing her skillset: "We have been looking for similar opportunities for [Plaintiff] to have similar ownership opportunities. We are worried that she may have been spread too thin with scheduling, administrative responsibilities, and general team support. Despite trying to change our processes to ease the burden, I am not sure it has been sufficient. As we shift the team structure to . . . . more specialization, I look forward to seeing [Plaintiff] take the lead on data coordination, build more relationships with external partners, and support our trial to success." (Rucker Dep. Exhibit 3, *2018 Performance Review*, HARVARD 45).

Response:  Admitted.

21. Plaintiff testified that she felt this performance review was "fair." (Rucker Dep., p. 55).

Response:  Denied in part.  Plaintiff admits that it is a fair assessment that Plaintiff was "spread too thin" and Defendant was "looking" for "similar opportunities" that had been

awarded to her White comparators.  Denied to the extend Statement of Fact 21 seeks to

communicate that Plaintiff was ***actually*** given similar opportunities.  Scott Dep. pg. 30-31;

George Dep. pg. 13-15, 17-19; Kahn Dep. pg. Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

**Position Reclassification**

22. Several months later, in the fall/winter of 2018, Plaintiff and Ms. Galvin began discussing

the reclassification process for Plaintiff's position. (Rucker Dep., pp. 103-104).

Response:  Admitted.  Further responding, at that time, Defendant was already promoting and

reclassifying Plaintiff's White comparators.  George Dep. pg. 13-15, 17-19; Kahn Dep. pg.

17-19, 21-22, 25-30, 36-37.

23. In December 2018, Plaintiff's position was formally extended through March 20, 2020.

By this time, Plaintiff's salary had increased to $31.43 per hour, or $57,196.84 per year as a

result of structural increases under the collective bargaining agreement between Harvard and the

HUCTW. (Rucker Dep., p. 48).

Response:  Admitted.

24. Plaintiff and Ms. Galvin began preparing the Job Review Form together. (Rucker Dep.,

pp. 100-102). Plaintiff does not dispute any of the content of the Job Review Form. (*Id.* at p.

101).

Response:  Denied in part.  Plaintiff admits that eventually Defendant began to consider her

for reclassification.  To the extent Statement of Fact 24 seeks to communicate that Defendant

timely began the process, compared to her White comparators, or began in only because she

had complained that Defendant's failure was due to racial bias, Statement of Fact 24 is

denied.  George Dep. pg.  44, 48, 51.

25. In the Job Review Form that was ultimately submitted, Ms. Galvin noted that a reclassification of Plaintiff's grade, job title and salary was appropriate because Plaintiff was already performing many or all of the job duties she would be expected to perform in her new role. (Rucker Dep. Exhibit 7, *Job Review Form*, HARVARD 28-30).  Specifically, Ms. Galvin noted that Plaintiff was initially hired to provide coordination and administrative support to the DDI team and to "optimize the schedules of the team and the program director, curate meeting agendas, document meetings minutes, and track and circulate action items." (*Id.* at HARVARD 27). She noted further that she was now managing and serving as the lead team member for engagement with Harvard's Internal Review Board, collecting data for DDI's Team Birth project, engaging in meeting management tasks by preparing and managing meeting agendas and leading meetings, and developing external partnerships. (*Id.* at HARVARD 27-32).

Response:  Admitted.

26. In March 2019, Ms. Galvin submitted the Job Review Form in support of Plaintiff's reclassification from a Grade 54, Project Coordinator I to a Grade 55, Project Coordinator II/Senior Project Coordinator, to Elissa Brennan, Director of HR and Recruitment Services for Harvard's School of Public Health. (*Id.*; Brennan Decl. at ¶ 11).

Response:  Denied in part.  Plaintiff admits that eventually Defendant began to consider her for reclassification.  To the extent Statement of Fact 26 seeks to communicate that Defendant timely began the process, compared to her White comparators, or began in only because she had complained that Defendant's failure was due to racial bias, Statement of Fact 26 is denied.  George Dep. pg.  44, 48, 51.

27. In the Job Review form, Ms. Galvin listed $65,775 as the new salary she recommended for Plaintiff, which would constitute a raise of almost 15%. ((Rucker Dep. Exhibit 7, *Job Review Form*, HARVARD 27; Brennan Decl. at ¶ 12).

Response:  Admitted.

28. Regardless of Ms. Galvin's recommendation for a new salary, Plaintiff's salary in her new position would need to be kept in line with other Grade 55 employees. (Brennan Decl. at ¶ 13). A salary increase, consistent with a reclassification at Plaintiff's grade level, would typically be the equivalent of between 3% and 7% of an employee's annual salary. (*Id.*)

Response:  Denied.  Prior to Plaintiff's reclassification, Defendant proposed to promote Avery Plough, who had previously been the same level as Plaintiff to a salary of $100,000. Kahn Dep. pg. 19-22, 28-30.

29. Indeed, when a member of Ariadne's internal talent team, Lauren Ayer, told Ms. Galvin that she was concerned that the Harvard School of Public Health HR employees overseeing the job reclassification would say the recommended amount was too high and asked her how she had arrived at the number, Ms. Galvin responded, "better to start high no?". (Brennan Decl., Exhibit B, *IM Exchange between Lauren Ayer and Grace Galvin*).

Response:  Denied.  Defendant had previously increased the salaries of Plaintiff's white comparators by percentages of 22.6, 18.09, 16.7, 11.22 and 10.57.  Plaintiff's Exhibit 4, Ex. A; *see also* SOF 48.

30. Ms. Brennan submitted Plaintiff's Job Review form to the Harvard School of Public Health Job Review Committee in May 2019. (Brennan Decl. ¶ 14).

Response:  Denied in part.  Plaintiff admits that eventually Defendant began to consider her for reclassification.  To the extent Statement of Fact 30 seeks to communicate that Defendant

11

timely began the process, compared to her White comparators, or began in only because she had complained that Defendant's failure was due to racial bias, Statement of Fact 30 is denied.  George Dep. pg.  44, 48, 51.

31. On or around May 7, 2019, Ms. Brennan informed Plaintiff that the committee had approved a reclassification from a Grade 54 Project Coordinator I to a Grade 55 Project Coordinator II/Senior Coordinator role retroactive to March 11, 2019. (Rucker Dep. Exhibit 8, *May 2019 Letter*). In connection with the reclassification, Plaintiff's salary was increased to $33.52 per hour for a 35-hour week, or, $61,000 per year. (Brennan Decl. ¶ 15). This increase was equivalent to a raise of $3,803.16 per year, or approximately 7% of her former salary. (*Id.*)

Response:  Admitted.

**Plaintiff's Resignation**

32. Plaintiff was disappointed with the amount of her salary increase. (Rucker Dep., p. 132). Plaintiff testified that her belief that her white or non-Black colleagues were being paid at a higher rate than she had been was based on (1) Ms. Galvin's initial request for 15%, because she did not believe Ms. Galvin would have asked for a 15% raise if this amount was not realistic and concluded that Ms. Galvin must have been able to obtain a raise of this size for the other colleagues she supervised, who were white (Rucker Dep., pp. 139, 117); and (2) a conversation she had with grants manager Kizzy Scott, a BWH employee, who told her she should advocate for a higher raise. (*Id.* at 117-118).

Response:  Admitted.

33.  Plaintiff acknowledged that she never "had any direct figures . . . specific figures of anyone's salary." (Rucker Dep., 118).

Response:  Admitted.

34. Plaintiff was also disappointed about the length of time she perceived she would have to wait until her next promotion to the position of Project Manager; specifically, she claims she was informed she would have to wait at least a year before she would receive another promotion to the position of Project Manager. (Rucker Dep., p. 141).

Response:  Denied.  Plaintiff did not "perceive" the amount of time she would have to wait for a promotion.  Plaintiff was told that she would have to wait at least one year, while Plaintiff's White comparators did not have to wait.  Scott Dep. pg. 30-31.

35. Plaintiff based this belief on a conversation she had with Ms. Lieb, and Justine Kahn, her then-manager who was new to Ariadne (Rucker Dep., p. 141-142), and, information she gathered from a July 2019 Ariadne-wide "all-hands" meeting conducted by members of the Talent Team (*id.* at 151-153).

Response:  Denied in part. Id.

36. At this meeting, members of the Ariadne Talent Team attempted to clarify aspects of the reclassification process, and suggested that the parent institutions, BWH and Harvard, required strong justification for reclassifications and underscored that employees should already be performing the job duties of their new roles for a significant period of time before reclassification was appropriate. (Rucker Dep., p. 151-153).

Response:  Denied.  Defendant did not hold Plaintiff's White comparators to the same one year standard.  Id.

37. Plaintiff testified that at the time of her reclassification, in or around April and May 2019, she had started taking on additional responsibilities, consistent with a Project Manager, and had even been named the "Project Manager" on a grant application. (Rucker Dep., p. 149). Her supervisor at the time of her resignation, Justine Kahn, also testified that she "had been given the

13

opportunity to manage one of the projects. (Pichette Decl., Exhibit F, Deposition of Justine Kahn ("Khan Dep."), p. 31). She had just started managing it before she departed. *Id.* Plaintiff testified that while she did not expect to be reclassified immediately after being reclassified in May 2019, she would have expected a reclassification in "maybe six months or so." (Rucker Dep., p. 149).

Response: Admitted.

38. Plaintiff resigned her employment shortly thereafter, on August 9, 2019. (Rucker Dep., p. 157).

Response: Denied.  Plaintiff was constructively terminated due to the negative effects her workplace was causing her health, one day after her then manager, Justine Kahn, informed her that she (Ms. Kahn) had spoken to upper management about promoting Plaintiff and was told that Defendant only promotes "strong" candidates, who were all White.  Kahn Dep. pg. 25-28.

39. After Plaintiff submitted her resignation, she talked to Amber Weiseth, a member of management at Ariadne and on the DDI team, who told her she "wished [she] had come to her before" submitting her resignation because she had Plaintiff in mind for a promotion to Project Manager once their new project, Team Birth 2.0, received funding. (Rucker Dep., p. 174).  Ms. Weiseth made a similar comment to Plaintiff's supervisor, Justine Kahn.  (Kahn Dep., p ___). Plaintiff took the weekend to reconsider, but ultimately resigned because she did not believe she had "clearcut instruction, direction, [or] guidance on how [she] was going to get to project manager." (Rucker Dep., p. 175).

Response:  Denied.  Amber Weiseth made no effort to speak to Ms. Kahn or Plaintiff about the alleged restructure until after Plaintiff had been constructively terminated and then replaced Plaintiff with a White.  Kahn Dep. 39-41.

Case 1:20-cv-11761-NMG   Document 34   Filed 03/25/22   Page 15 of 27

40. Plaintiff also talked to Kit Nichols, a member of the Ariadne Talent Team and a BWH employee, who invited her to apply for a BWH position of Project Manager on the Serious Illness team. (Rucker Dep. p., 176-177). Plaintiff was not interested in applying to this position because she perceived the Serious Illness team to be difficult to work for. (*Id.*, p. 178-179).

Response:  Denied.  Plaintiff did not apply for another position with Ariadne Labs because, after complaining about race discrimination to Amber Weiseth, Kit Nochols (Human Resources) Justine Kahn, Grace Galvin and Dr. Neel Shah her health was affected by the overall hostile work environment of Ariadne Labs.  Scott Dep. pg. 38; George Dep. pg. 13-15, 17-18; Kahn Dep. pg. 27-28.

41. During her employment with Harvard, Plaintiff did not apply to any open, posted positions at Harvard. (Rucker Dep., p. 178).  Plaintiff also did not attempt to initiate the reclassification process with Human Resources on her own initiative. (Brennan Decl., ¶ 17).

Response:  Denied. Plaintiff specifically complained that her reclassification was slower than those of her White comparators and asked how she could be promoted faster.  Scott Dep. pg. 30-31, 38.  George Dep. pg. 13-15, 17-18, 48. Kahn Dep. pg. 25-27;

## Comparator Data

42. At deposition, Plaintiff identified the Ariadne employees she believed had been promoted at a faster rate, or, who were paid more for comparable work. (Rucker Dep. pp. 104, 181). She also sought information regarding, *inter alia*, these individuals' positions held, dates for promotions, transfers, and/or reclassifications, and rate of pay. (Pichette Dec., Exhibit G, *Harvard's Amended Response to Plaintiff's First Set of Interrogatories to Defendant*, No. 8 and Revised Exhibit A).

Response:  Denied in part.  In addition to those identified at deposition, Plaintiff can also

identify that she was promoted more slowly than Avery Plough, Grace Galvin, Andrew

Juraschek, Hanna Ratcliffe, Emily George, Jim Sachetta, Francie Maloney and Jane

Kavanaugh – all white.   George Dep. pg. 44, 51.

43. In its responses to Plaintiff's requests for discovery, Harvard attested that four of the

individuals identified by Plaintiff, Jocelyn Fifield, Chloe Pagonis, Karen Schienherr, and Hannah

Ratcliffe, were not employed by Harvard during the relevant time period and Harvard did not

and does not have direct access to the information requested in its custody, possession or control.

(Pichette Dec., Exhibit H, *Harvard's Amended Response to Plaintiff's First Set of*

*Interrogatories*, No. 8).

Response:  Denied.  Ariade Labs, through an agreement between Harvard and Brigham,

jointly managed and made personnel decisions based upon the Lab's needs. Scott Dep. pg 8-

10; George Dep. pg. 50-51. Kahn Dep. pg. 11.

44. Harvard produced information regarding the date of hire at Harvard; the date of hire at

Ariadne; promotions, transfers, hires into new positions and reclassifications; and the pay rate,

for all Ariadne employees who held the title "Coordinator" at either a Grade 54 or Grade 55 level

during Plaintiff's employment, although noted that not every individual with the title

"Coordinator" performed the same or similar tasks or required the same or similar level of skill,

effort, responsibility, or working conditions.  (Pichette Dec., Exhibit H, *Harvard's Amended*

*Response to Plaintiff's First Set of Interrogatories*, No. 8. and Revised Exhibit A; Brennan Decl.

Exhibit A HARVARD 275-368, *Employee Resumes and Reclassification Documentation*).

Response:  Denied in part.  Admitted that Harvard produced documents as described in

Statement of Fact 44.  To the extent Statement of Fact 44 seeks to communicate that the rate

of promotion presented is consistent with the recollection of Plaintiff, Kizzy Scott, Emily

George and Justine Kahn, Statement of Fact 44 is denied.  George Dep. pg. 13-15, 17-19; 44,

51,  Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

45. Although the employee's names have been anonymized as Employee A, B, C, D, E, F, G,

H, I, J, K, and L, responsive information about each of the Harvard employees identified by

Plaintiff in Interrogatory 8 and Harvard's Amended Response to Interrogatory No. 8 and

Harvard's Revised Exhibit A has been produced. (Pichette Dec., Exhibit H, *Harvard's Amended

Response to Plaintiff's First Set of Interrogatories*, No. 8 and attestation page). All Grade 55

Harvard employees working at Ariadne at the time of Plaintiff's resignation are captured

(anonymously) in Harvard's Revised Exhibit A.  (*Id.*; Brennan Decl. ¶ 16). In its responses,

Harvard identified the self-reported EEO data of Employees A-L. *Id.*

> Response:  Denied in part.  Admitted that Harvard produced documents as described in
>
> Statement of Fact 45.  To the extent Statement of Fact 45 seeks to communicate that the rate
>
> of promotion presented is consistent with the recollection of Plaintiff, Kizzy Scott, Emily
>
> George and Justine Kahn, Statement of Fact 44 is denied.  George Dep. pg. 13-15, 17-19; 44,
>
> 51,  Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

46. Notably, the only other Grade 54 or 55 employee who worked on Plaintiff's team and

reported to Plaintiff's supervisors in the relevant time period was Employee G, a Grade 54

Research Assistant who was reclassified to a Grade 55 Research Assistant IV Non-Lab employee

in June 2018. (Brennan Decl., ¶ 19).

> Response:   Denied in part.  Statement of Fact 46 fails to consider all of Plaintiff's white
>
> comparators.  To the extent Statement of Fact 46 seeks to communicate that the rate of
>
> promotion presented is consistent with the recollection of Plaintiff, Kizzy Scott, Emily

George and Justine Kahn, Statement of Fact 46 is denied.  George Dep. pg. 13-15, 17-19; 44, 51,  Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

47. The other Grade 54 or 55 Project Coordinators who worked at Ariadne during Plaintiff's employment were: Employees B, D, and I.  (*Id.* at ¶ 20).

Response:  Denied in part.  Statement of Fact 47 fails to consider all of Plaintiff's white comparators.  To the extent Statement of Fact 47 seeks to communicate that the rate of promotion presented is consistent with the recollection of Plaintiff, Kizzy Scott, Emily George and Justine Kahn, Statement of Fact 47 is denied.  George Dep. pg. 13-15, 17-19; 44, 51,  Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

48. The data indicated the following:

### **Rate of Pay Compared to White or Male Colleagues**

a.  At the time of her resignation, Plaintiff was the highest paid Grade 55 employee at Ariadne at a rate of $33.52 per hour for a 35-hour workweek, equivalent to $61,000 per year.  (Pichette Dec., Exhibit H, *Harvard's Response to Plaintiff's First Set of Interrogatories*, No. 8. and Revised Exhibit A; Brennan Decl. ¶ 16).[5]

b.  During Plaintiff's employment at Ariadne, there was only one other employee in the Project Coordinator role who was reclassified from a Grade 54 Project Coordinator to a Grade 55 Senior Project Coordinator: Employee D, a white woman. (Brennan Decl. ¶ 21). When Employee D was reclassified, her salary was increased from $28.74 per hour for a 35-hour work week, at $52,306 per year, to $32.14 per hour or $58,000 per year, which is several thousand dollars less than

---

[5] While Employee A earned a higher annual salary, his hourly salary as a Grade 55 employee was lower because he worked a 40-hour work week compared to Plaintiff's 35-hour work week.

Plaintiff's salary as a Grade 55 employee ($33.53 per hour or $61,000 per year). (*Id.*)

c. At all relevant times, and as set forth below, Plaintiff's salary was <u>higher</u> than the other Grade 54 or 55 Project Coordinators:

|  | Plaintiff | Employee B | Employee D | Employee I |
|---|---|---|---|---|
| March 2017 | $29.67 per hour (Grade 54); | | $28.74 per hour (Grade 54) | |
| March 2018 | $30.26 per hour (Grade 54) | $27.95 per hour (Grade 54) | $28.74 per hour (Grade 54) | |
| March 2019 | $33.52 per hour (Grade 55) | $28.74 per hour (Grade 54) | $28.74 per hour (Grade 54) | $28.02 per hour (Grade 54) |
| August 2019 | $33.53 per hour (Grade 55) | $32.14 per hour (Grade 55) | $32.14 per hour (Grade 55) | $28.02 per hour (Grade 54) |

(Pichette Dec., Exhibit H, *Harvard's Amended Response to Plaintiff's First Set of Interrogatories*, No. 8. and Revised Exhibit A.)

d. Plaintiff only worked with two Grade 54 or 55 male colleagues at Ariadne, Employee A and Employee F. (*Id.*) In the relevant time periods, both employees worked as Operations Coordinators: Employee A applied to a posted position as a Grade 54 Operations Coordinator I in or around August 2017 and stayed in the role until applying to a different posted position in January 2018; Employee F was hired as a Grade 54 Operations Coordinator I in April 2018, and his position was

19

reclassified to a Grade 55 Senior Operations Coordinator in April 2019. (*Id.*; Brennan Decl. ¶ 22).

e. Although they both utilize the term "Coordinator", the positions of Operations Coordinator and Project Coordinator are not substantially similar; while a Project Coordinator I typically assisted with scheduling and administrative duties related to particular projects, and utilized organizational, proofing, event management and research skills, an Operations Coordinator is responsible for the needs of the physical facilities, and utilized skills relating to management, physical operations and planned expansions and renovations, real estate, and information technology services. (Brennan Decl. ¶ 23 and Exhibit A, HARVARD 318-322).

    i. Specifically, an Operations Coordinator is responsible for performing the following duties:

        1. Coordinate the facilities needs of Ariadne Labs, including <u>project-manage</u> any expansion and renovation of office space; scope other real estate options by meetings with realtors and keeping on top of inventory and pricing in local market; provide regular updates and analysis on space and seating planning projections to the Executive Team and others as needed; liaise with the Harvard School of Public Health and building facilities teams for space planning, renovations, maintenance, and requests;

        2. Oversee organization-wide implementations and maintenance of systems and databases, for example Google Apps for Education,

Salesforce, and Adaptative Insights, as well as offer user support when necessary;

3.   Manage and delegate administrative support staff and distribution of office-wide support needs;

4.   Lead team meetings including the Monthly Operations meeting and weekly HR/Operations meeting;

5.   Manage the Thread (Ariadne's Intranet) including design, formatting and content updates; coordinate and create internal communications through the intranet; display monitors and formal email correspondence regarding organizational matters, including but not limited to personnel activities, office events, and guideline/policy updates;

6.   Organize and plan internal and external events such as office retreats, lectures, social events;

7.   Triage and route IT requests to the appropriate Harvard and BWH departments and track and monitor as appropriate;

8.   Manage and track office inventories of equipment and supplies, manage relationships with vendors, and analyze cost-effective decisions;

9.   Gather and analyze spending information to create operations budgets and costs and regularly review and monitor actual expenses.

(Brennan Decl. ¶ 23 and Exhibit A, HARVARD 318-323; 352-355).

f.  For the approximately five-month period he worked as an Operations Coordinator, Employee A was paid $31.01 per hour, or $56,430 per year. Employee F was paid $28.57 per hour or $52,000 per year as a Grade 54 Operations Coordinator I, and paid $31.59 per hour or $58,500 per year. Notably, when Employee A applied for and received the posted position of a Grade 55 Senior Special Project Coordinator in September 2018, his hourly salary of $32.93 per hour[6] was lower than Plaintiff's hourly salary of $33.52 per hour as a Grade 55 employee. (Pichette Dec., Exhibit G, *Harvard's Amended Response to Plaintiff's First Set of Interrogatories*, No. 8. and Revised Exhibit A.)

g.  Neither Employee A nor Employee F reported to the same management team, as Plaintiff, including Grace Galvin, Amber Weiseth, Justine Kahn, or Neel Shah, in the relevant time period. (Brennan Decl., ¶ 22). Instead, Employee F reported to Cathy Breen, then-Chief Operations Officer, and Employee A reported to Ms. Breen, and, then, from January 2018 to the present, Asaf Britton, the Executive Director at Ariadne Labs. (*Id.*)

**Rate of Reclassification Compared to her White Colleagues**

h.  Plaintiff received a reclassification faster than the only other Grade 54 Project Coordinator who received a reclassification to a Grade 55 position during her employment, Employee D. (Brennan Decl. ¶ 20-21). At the time of her

---

[6] Employee A worked a 40- hour work week as opposed to Plaintiff's 35-hour work week. (Pichette Dec., Exhibit G, Harvard's Amended Response to Plaintiff's First Set of Interrogatories, No. 8. and Revised Exhibit A.)

reclassification, Employee D had been a Project Coordinator I at the Harvard

School of Public Health for approximately 2.75 years. (Brennan Decl., ¶ 21). By

way of comparison, Plaintiff was in her role as a Project Coordinator I at Harvard

for approximately two years before she was reclassified. (Pichette Dec., <u>Exhibit</u>

<u>G</u>, *Harvard's Amended Response to Plaintiff's First Set of Interrogatories*, No. 8.

and Revised Exhibit A.) In her Job Review Form, Employee D's manager

reported that she had been a "key asset" to her program, and that the move to

Senior Project Coordinator reflected her:

> "demonstrated responsibility of coordination of the team, including working independently from the project manager or PI with minimal supervision. Employee D has successfully demonstrated skill in navigating and managing external partners on her projects with clear and consistent communication. Additionally, [Employee D's] management of a recent proposal engendered confidence in the team and is an important component of this promotion. The team has counted on [Employee D] in her support to development of workplans, timeline and reports to funders while she has consistently managed conflicting priorities, anticipating and resolving problems."

> (Brennan Decl. ¶ 21).

i.    Notably, Employee B (white woman), transferred to Ariadne as a Grade 54

Project Coordinator in October 2017. (Pichette Dec., <u>Exhibit G</u>, *Harvard's*

*Amended Response to Plaintiff's First Set of Interrogatories*, No. 8. and Revised

Exhibit A.) She did not receive a reclassification or promotion throughout the

remainder of Plaintiff's employment with Ariadne (August 2019). (*Id.*)

j.    The only other Grade 54 employee working on the DDI team with Plaintiff in the

relevant time period was Employee G (white woman). (Brennan Decl., ¶ 19).

Employee G had been a Research Analyst at Harvard since May 2016. (*Id.*) She

was reclassified to a Grade 55 Research Assistant IV in April 2018, after two

years in her position. (*Id.*) She was not reclassified or promoted again during

Plaintiff's employment. (*Id.*)

**Employee F**

    k.   When Employee F was reclassified from a Grade 54 Operations Coordinator to a

Grade 55 Senior Operations Coordinator, his supervisor, Ms. Breen wrote that

<u>over the past year</u>, Employee F had been the point of contact for all administrative

staff, had effectively delegated tasks to others while working hard, and had

"created a leadership role for himself." (Brennan Decl., ¶ 23 and Exhibit A,

*Employee F Job Review Form*, HARVARD 318).

**Employee A**

    l.   Employee A, whose position changed several times throughout Plaintiff's

employment, took a different path to advancement: the majority of Employee A's

mobility was achieved by applying for posted positions, as opposed to undergoing

the reclassification process like Plaintiff. ((Pichette Dec., <u>Exhibit G</u>, *Harvard's*

*Amended Response to Plaintiff's First Set of Interrogatories*, No. 8. and Revised

Exhibit A; Brennan Decl., ¶ 24).

    m.  As noted above, the majority of Employee A's mobility at Ariadne occurred when

he applied to and received posted positions. (Brennan Decl. ¶ 24; Pichette Dec.,

<u>Exhibit G</u>, *Harvard's Amended Response to Plaintiff's First Set of*

*Interrogatories*, No. 8. and Revised Exhibit A.)  In or around January 2018,

Employee A applied to and received the position of Executive Assistant to the

Chief of Staff, working in the Office of the Executive Director. (Brennan Decl., ¶

25). He was responsible for executing various strategic priorities, including

managing the Executive Director's "network of relationships with external

stakeholders" and his portfolio of externally facing materials and licenses and

reporting requirements. (*Id*). He was also responsible for monitoring, managing

and tracking the Executive Director's emails as appropriate; supporting the

Executive Director in fostering relationships with key stakeholders; maintaining

and updating various materials relating to the Executive Director; creating and

managing agendas for meetings with the Office of the Executive Director; and

partnering with the Chief of Staff for responsibilities relating to Ariadne's

advisory board. (*Id.*)

n.   In or around September 2018, Employee A applied to and received a posted

position of Special Projects Coordinator, in the office of the Executive Director,

working under the "C[hief] O[perations] O[fficer]'s minimal supervision" to

"facilitate the work of Ariadne Labs executive and leadership teams. (Brennan

Decl., ¶ 26). The person in this position was also responsible for, *inter alia*,

"assist[ing] with managing organizational-wide strategic initiatives, both

independently and in coordination with other teams." (*Id.* at Exhibit A,

HARVARD 340).

o.   In or around July 2019, the Harvard School of Public Health concluded that the

position itself had been misclassified based on the needs of the Executive

Director; the position should have been graded as a Grade 56 position, working as

the Strategic Initiative Manager, essentially the Chief of Staff for the Executive

Director of Ariadne Labs.  (Brennan, Decl.¶ 27).  The job duties this employee

actually conducted are set forth in the job description for the *Strategic Initiatives Manager*. (*Id.*) The reclassification was based more on the appropriate classification for the role itself, rather than an assessment of Employee A's performance in the role. (*Id.*)

Response :      Denied. The data reflects that Employee A was promoted or reclassified three times in 10 months.  Employee A's salary was increased by 22.6% after promotion 1, 1.7% after promotion 2, 18.09% after promotion 3 and 16.7% after promotion 4.  Employee B's starting salary was higher than Plaintiff's starting salary.  Employee D was promoted within 15 months of hire and Employee D's salary increase was 11.22%.  Employee F was promoted in 12 months and Employee F's salary increase was 10.57%.  Plaintiff's reclassificaiton took 24 months to achieve and her overall percentage increase was 6.6%. Plaintiff Affi., Exhibit 1.

Further responding, Statement of Fact 48 fails to consider all of Plaintiff's white comparators.

To the extent Statement of Fact 48 seeks to communicate that the rate of promotion presented is consistent with the recollection of Plaintiff, Kizzy Scott, Emily George and Justine Kahn, Statement of Fact 46 is denied.  George Dep. pg. 13-15, 17-19; 44, 51, Kahn Dep. pg. 17-19, 21-22, 25-30, 36-37.

March 25, 2022                                   The Plaintiff,
                                                 Amber Rucker,
                                                 By her attorney,

                                                 /s/ *Suzanne L. Herold*
                                                 _____
                                                 Suzanne L. Herold (BBO# 675808)
                                                 Herold Law Group, P.C.
                                                 50 Terminal Street
                                                 Building 2, Suite 716
                                                 Charlestown, MA 02129
                                                 (617) 944-1325 (t)
                                                 (617) 398-2730 (f)
                                                 suzie@heroldlawgroup.com

<u>CERTIFICATE OF SERVICE</u>

I, Suzanne L. Herold, hereby certify that this document was served upon Defendant's counsel via electronic filing on March 25, 2022.


*/s/ Suzanne L. Herold*
_____
Suzanne L. Herold